**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ADAM TURNER, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-0888 |
| | § | |
| COMPUTER SCIENCES CORP., | § | |
| | § | |

**MEMORANDUM AND OPINION**

Adam Turner, who is African-American, sued his former employer, Computer Sciences Corporation ("CSC"), alleging that he was laid off from his job as a pipe fitter because of racial discrimination and in retaliation for his complaints about CSC's approach to hiring electricians and to allocating work between electricians and pipe fitters. (Docket Entry No. 22 at 1). During his employment, Turner filed complaints with CSC's Human Resources Department and spoke out against how the company hired electricians in his division. (Docket Entry No. 30-7 at 10, 23–24). Over nine months after making these complaints and comments, Turner was laid off, along with three Caucasian and two Hispanic employees. CSC asserts that the layoffs resulted from the demand by its client, NASA, for cost reductions. (Docket Entry No. 22 at 3–4). Turner timely filed administrative discrimination and retaliation claims and, after he received a notice of right to sue letter, filed suit in state court. CSC timely removed. Turner alleged racial discrimination and retaliation under 42 U.S.C. § 1981 and the Texas Labor Code. (Docket Entry No. 22). After discovery, CSC moved for summary judgment on all of Turner's claims. (Docket Entry No. 30). Turner responded to the motion, and CSC replied. (Docket Entry No. 32, 33).

Based on the pleadings; the motions, responses, and replies; the record; and the relevant law, this court grants CSC's motion for summary judgment and enters final judgment by separate order. The reasons for these rulings are explained in detail below.

## I. Background[1]

### A. The Parties and Witnesses

#### 1. CSC

CSC is in the business of providing facility maintenance and construction services on a contract basis. This lawsuit arises out of CSC's contract work for NASA at the Johnson Space Center.

Michael Matteson, CSC's program manager at the Johnson Space Center, supervised Patricia A. McCoy, CSC's Human Resources and Labor Relations Manager from 2008 to 2013. (Docket Entry No. 30-5 at 1, McCoy Decl. at ¶¶ 2, 5). CSC employed maintenance, property, equipment, and business management workers to perform the Johnson Space Center contract. (*Id.* at 2; McCoy Decl. ¶ 7). A coalition of several trade unions represented these workers under a collective bargaining agreement. (Docket Entry No. 30-7, Ex. 3, at 29; Collective Bargaining Agreement at 1). The collective bargaining agreement recognized that CSC had the authority and right to "decide the number of employees required with due consideration to the proper craft classification" and to "[h]ire and lay off employees as [CSC] feels appropriate to meet work requirements and / or skills

---

[1] The summary judgment evidence includes the testimony of Chris Provenzano, the manager of CSC's maintenance department; Curtis Vise, one of Turner's coworkers; Patricia McCoy, CSC's human-resources manager at the Johnson Space Center; Adam Turner, the plaintiff; Thomas Munsch, a CSC supervisor; and Melvin Winkelman, Turner's foreman. The documents include: CSC's employment policies, McCoy's investigative notes, reduction-in-force information and history, Turner's termination notice, and Turner's grievances submitted to CSC's HR department; Turner's resume and certificates of achievement; letters from James Holder and L.J. Swain; and a memorandum of Janis Roderman to McCoy.

2

required. [CSC could] hire employees by name who have special skills or have previous maintenance experience." (*Id.* at 31; CBA at 3, Art. II, Sec. 1 B.–C.). The collective bargaining agreement also stated that it was "understood that all employees w[ould] work together harmoniously as a group and as directed by [CSC]." (*Id.* at 32). The agreement recognized that the unions retained the power to appoint job-site representatives who would "be the last journeyman to be laid off in his craft provided that he is qualified to perform the required work." (*Id.* at 36; CBA at 8, Art. IX). Additionally, each "Local Union" was to "designate one (1) official as its representative." (*Id.* at 37; CBA at 9, Art. XI). The work day was 7 a.m. to 5 p.m., Monday through Friday, with a 30-minute lunch break. (*Id.* at 39; CBA Art. XIV.1; Docket Entry Nos. 30-1 at 6; 30-4 at 6, 30-5 at 1–2).

CSC hired Chris Provenzano in 1984. He worked for CSC at NASA for close to 29 years and during the relevant period was CSC's Maintenance Manager. (Docket Entry No. 30-3 at 2; 30-5 at 2, ¶ 8). Provenzano's oversight of the Maintenance Department, CSC's largest department, included supervising about 150 employees, including Turner; maintaining safety protocols; and ensuring that CSC met its government-contractor requirements. (Docket Entry No. 30-3 at 3, 8; No. 30-5 at 2, ¶ 8; No. 30-6 at 10–11). The Maintenance Department that Provenzano managed included 15 subdivisions or "shops." (*Id.* at 4). Turner was working at the Energy Management Control Systems ("EMCS") "Elect. 1 Shop" when he was laid off.

In March 2008, Thomas Munsch became a Maintenance Supervisor working under Provenzano. (Docket Entry No. 30-9 at 2). Munsch supervised about 50 employees in three Maintenance Department shops, including the EMCS Elect. 1 shop where Turner worked. (Docket Entry No. 30-6 at 12; 30-9 at 2). The Elect. 1 shop was a dual-purpose shop with both electrical

workers and pipe fitters. (*Id.* at 8, Tr. 13). Usually, an electrician and a pipe fitter would be sent together to complete a work order. (Docket Entry No. 30-4 at 14; Tr. 13). The Elect. 1 shop had seven workers, consisting of three electrical workers, three pipe fitters, and one foreman, Melvin Winkelman. (*Id.*; Docket Entry No. 30-4 at 11; Vise Depo. Tr. at 29). Of the seven employees, four were in a protected class. (Docket Entry No. 30-10 at 10, Winkelman Depo. Tr. at 27). Turner was the only Black employee. (*Id.*).

The foreman, Winkelman, was a pipe fitter who would occasionally work on orders that called for electrical work that presented particularly difficult problems. (Docket Entry No. 30-4 at 11–12; Vise Depo. Tr. 29–30). His primary responsibilities as foreman included distributing work orders and making sure that the orders were completed. (*Id.*). Winkelman would answer questions about "who did what work," but he was not responsible for evaluating employees. (Docket entry No. 30-10 at 8; Winkelman Depo. Tr. at 8). Winkelman lacked authority to discipline, hire, or fire. (*Id.* at 4; Winkelman Depo. Tr. at 10; Docket Entry Nos. 30-6 at 12-13; 30-4 at 11-14, 16-17; 30-10 at 2, 3, 4, 8). If Winkelman had trouble with a shop employee, he was to report it to a maintenance supervisor for appropriate action and not take action against the employee himself.

Curtis Wayne Vise was one of the pipe fitters employed in the EMCS shop. (Docket Entry No. 30-4 at 6). Vise was the steward for the local pipe fitter union. (*Id.*). In that capacity, he was appointed to talk to employees about their work habits and about work rules, and to ensure that the employees were following union rules and protocols. (*Id.*). As pipe fitter steward, Vise tried to solve employment problems before CSC or union management had to get involved. (*Id.* at 6). Vise would discuss problems with employers "quietly [to] try to steer them towards adhering to [union] rules." (*Id.*). Though he was the pipe fitter steward, Vise lacked authority to take specific action

4

on the site. "The only steward that [had] any authority [on] the site [was] the bull steward, Russell Nix." (*Id.*).

To summarize, CSC provided maintenance support for NASA's Johnson Space Center under a government contract. Matteson was the program manger for this contract, and McCoy was the Human Resources manager. Provenzano was the Maintenance Manager over 15 CSC departments, including the EMCS Department's Elect. 1 shop where Turner worked. Munsch was the Maintenance Supervisor who directly supervised the seven employees in the Elect. 1 shop. Turner's coworker, Vise, was the pipe fitter steward who reported to the union "bull" steward, Nix.

### 2. Turner

In 1977, Turner enrolled in a four-year program at the Local 211 Pipe Fitter Apprenticeship School. (Docket Entry No. 32-1, Turner Affidavit, at 1). In 1979, Turner began working for Johnson Control World, Inc. (*Id.*). In 1982, Turner graduated and received his Instrumentation Journeyman card. (*Id.*). In 1997, Turner left Johnson Control World to work for Honeywell, Inc. at its NASA location. (*Id.*). In 1999, Turner left Honeywell to work for Brown & Root, Inc., and, in 2005, worked in Afghanistan for a year. (*Id.*) When he returned in 2006, he applied to CSC. At that time, Provenzano did not have an opening. (*Id.* at 6, Tr. 10). When a position opened in the EMCS department, Provenzano contacted Turner and hired him without an interview because he was familiar with Turner's work. (Docket Entry No. 30-3 at 5, Provenzano Depo. Tr. at 9). Turner began working as a pipe fitter in CSC's Maintenance Elect. 1 shop on October 27, 2006. (Docket Entry No. 22 at 2). Turner spent most of his time doing instrumentation work, including "installations, troubleshooting, maintenance, calibrations, and repairs." (Docket Entry No. 32-1 at 2).

### B.     The Evidence of Turner's Workplace Issues

Of the seven workers in the EMCS Elect 1 shop, three were electricians: Don McIntosh, Chris Carlisle, and Charles Broussard, who left and was replaced by Tammy Hefner. (Docket Entry No. 30-6 at 14; Turner Depo. Tr. at 54). Turner believed that most of the work orders contained only pipe fitter work. He complained to management and to his bull steward, Nix, that there were too many electricians at CSC and that pipe fitters were doing electrical work and electricians were doing pipe fitter work. (*Id.* at 16, 22; Turner Depo. Tr. at 56, 66). When Michael Matteson, CSC's program manager, visited the Elect. 1 shop and asked whether the workers had anything to say, Turner "raised [his] hand and . . . told him [that:] 'I know this is going to be a bad taste in some people's mouth, but you're misallocating people around here to do an efficient job.'" (*Id.* at 24; Turner Depo. Tr. at 67). Turner also told Provenzano that the company "need[s] electricians but we don't need that many." (*Id.*). Turner recognized that when he "brought that up, a lot of people started cringing, because [he was] talking about people who [were] on the job . . . that [he believed] really don't need to be there." (*Id.*). Turner acknowledged that his statements in 2010 and 2011 angered the electricians — who made up half his shop — and testified that if he had been an electrician, he would have been offended. (Docket Entry No. 30-6 at 27–28; Turner Depo. Tr. 71).

Turner testified that after he broadcasted his views on the electricians working in his shop, a "lot of them had an issue" with him, but he believed that he had no problems getting along with the electricians because "they just stayed away" from him. (*Id.* at 25; Turner Depo. Tr. 68). The evidence shows that one of the electricians, Chris Carlisle, stopped talking to Turner altogether. Human Resources Manager McCoy stated that Turner "had to be separated from Chris Carlisle . . . because Mr. Carlisle refused to work with Mr. Turner." (Docket Entry No. 30-5 at 2, McCoy Decl.

¶ 11). Another electrician, Broussard, heard Turner's comments and "made up his mind that he was going to go find him another job" because of it. (*Id.*). The uncontroverted summary judgment evidence shows that Turner's statements angered the electricians he was required to work side by side with on many jobs. At a minimum, they did not talk with him. The evidence shows that Turner had greater difficulties with his coworkers than their refusal to talk to him.

In May 2010, McCoy received a complaint that Turner was creating a hostile work environment in the shop. McCoy interviewed the shop workers. (Docket Entry No. 30-5 at 2; McCoy Decl. ¶ 12). Most confirmed that Turner had been confrontational, loud, and threatening. McCoy's interview notes reflect that witnesses: heard Turner "holler screaming," threaten others, and thought that he "created hostile work environment"; other witnesses heard Turner make a threat, knew that he thought "no electricians should be in the shop," and had heard Turner "scream"; Tammy Helfner heard Vise and Turner, and Winkelman and Turner, raising their voices at each other; and stated that Turner "can get overly loud" and "confrontational over small things." (Docket Entry No. 30-5, Ex. 2, McCoy Interview Notes, at 13, 14, 20, 21, 22).

On June 18, 2010, Turner filed a grievance alleging that Nix, the union bull steward, failed to respond to his requests for information and that Vise, the pipe fitters' steward, questioned him about his early departures from work. The collective bargaining agreement required pipe fitters to work certain hours and prohibited them from unilaterally changing their hours. Vise told Turner that others had noticed his early departures and stated that he had a discussion with Winkelman, the foreman, about it. (Docket Entry No. 30-4 at 5, Vise Depo). Provenzano and Human Resources Department personnel met with Turner and confirmed that he was not asserting racial discrimination or harassment claims. (Docket Entry No. 30-5 at 2, McCoy Decl. ¶ 13; Docket Entry No. 30-5 at

7

24 (memorandum notes on meeting)).

On September 16, 2010, Vise submitted a complaint to Human Resources stating that Turner had threatened and cursed him without provocation. (Vise Depo. Tr. at 17; 9/16/10 complaint, Ex. B-1 to Vise Depo; McCoy Decl.). Provenzano investigated and learned that Vise and Turner were not getting along. Provenzano sent them Letters of Understanding reminding both of CSC's expectation that they respect each other. (Provenzano Depo. Tr. at 21, 30, 42; Turner Depo, 112, 142; Vise Depo. Tr. 23–24; Munsch Depo at 13; Letters of Understanding).

The record also shows complaints by NASA employees about Turner. (McCoy Dep. at 9; Provenzano Depo. Tr. at 17; Munsch Depo. Tr. at 17–18). While the existence of the complaints is undisputed, the circumstances are.

One complaint arose out of Turner's response to a work order involving a thermostat and the other arose from an altercation. (Docket Entry No. 30-3 at 10; Provenzo Depo. Tr. 18). The complaint about Turner's response to the work order came from a NASA secretary. She stated that Turner had refused to do the work that she asked and had shouted when she questioned him. Turner maintains that the work order asked him to investigate a thermostat but that the secretary asked him to relocate it. He refused because he wanted to return to the shop to talk to the foreman. (Docket Entry No. 30-6 at 38; Turner Depo. Tr. at 96). He testified that he never raised his voice at the secretary.

The altercation between NASA employees and Turner occurred at a parking lot. Turner had filed a complaint stating that NASA employees were parking where CSC trucks belonged. He testified that a NASA employee approached him and asked who had "made [Turner] king." (*Id.* at 37, Turner Depo. Tr. at 92). Turner asserted that he maintained his composure, but the NASA

8

employee raised his voice. (*Id.*). The summary judgment evidence does not contain any statements from the NASA employee involved in the altercation but it is clear from testimony of Turner, Provenzano, and McCoy's declaration that an altercation did occur and that NASA, CSC's client, complained about Turner.

### C.     The Layoffs

Layoffs were common at CSC. "[F]rom January 2010 to December 2012, CSC implemented almost 40 layoffs involving a total of 224 employees. Of that 224, 134 [were] white, 54 Hispanic; 33 Black, and 3 of two or more races." (Docket Entry No. 30-5 at 3, McCoy Decl. ¶ 18 and Ex. 4).

"In March 2011, NASA notified CSC that governmental budget cuts would require baseline cost reductions. The departmental managers, [including McCoy], were tasked with identifying what positions [they] could eliminate with the least impact on [the] operations." (*Id.* at ¶ 19). McCoy selected two positions, both held by white employees. Provenzano identified six positions in the maintenance department, held by three white employees, two Hispanic employees, and one Black employee — Turner. Other department managers selected four more positions, two held by white employees, one by a Hispanic employee, and one by an employee identified as belonging to more than one racial category. (*Id.* ¶ 20). Though Turner was one of six laid off in the Maintenance Department, he was the only one in the EMCS shop where he worked.

After the positions for layoff were selected, CSC's corporate Human Resources department reviewed and approved the selection. (*Id.* at ¶ 22). On March 24, 2011, CSC notified the sixteen individuals who were subject to the layoffs, including Turner.

### D.     Procedural History

After he was laid off, Turner filed discrimination claims with the United States Equal

9

Employment Opportunity Commission ("EEOC") and the Civil Rights Division of the Texas Workforce Commission on May 11, 2011. (Docket Entry No. 22 at 2). Turner's claim was submitted to the Texas Workforce Commission, which issued a notice of right to sue. (Docket Entry No. 22 at 2). Turner filed his state-court petition on January 16, 2013. (Docket Entry No. 1-1 at 2). CSC timely removed on March 29, 2013. (Docket Entry No. 1). Turner filed his first amended complaint on July 8, 2013, asserting discrimination and retaliation claims under 42 U.S.C. § 1981 and the Texas Labor Code § 21.051. (Docket Entry No. 22 at 5). Turner's § 1981 claim alleged that CSC interfered with his employment because of his race and his state-law claim alleged that he was wrongfully discharged because he had complained of racial discrimination. The factual basis for his complaint involves the difficulties and altercations he had with his coworker, Curtis Vise, and the CSC Human Resources Department's response.

## II.   The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. C. P. 56(a). "The movant bears the burden of identifying these portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402

F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**III.    Discussion**

    **A.    Discrimination**

The Fifth Circuit analyzes a § 1981 claim under the same standards as a claim under Title VII. When the evidence is circumstance, the *McDonnell Douglas* burden-shifting analysis determines whether summary judgment is appropriate. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The legal standard is well settled:

> To survive summary judgment under *McDonnell Douglas*, the plaintiff must first present evidence of a prima facie case of

> discrimination. If the plaintiff presents a prima facie case, discrimination is presumed, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the underlying employment action. If the employer is able to state a legitimate rationale for its employment action, the inference of discrimination disappears and the plaintiff must present evidence that the employer's proffered reason was mere pretext for racial discrimination.

*Davis*, 383 F.3d at 317 (citations omitted). The defendant's burden of articulating a legitimate, nondiscriminatory reason for its adverse employment action is a burden of production, not persuasion. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (5th Cir. 1993). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 507 (internal citations and quotation marks omitted). The defendant must only produce "admissible evidence, . . . which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 507.

Once the defendant has made that showing, the plaintiff must present summary judgment evidence that the explanation was pretextual. "On summary judgment . . . the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (citations omitted). "Once a Title VII [and 1981] case reaches the pretext stage, the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999).

If the employer meets its burden, the *prima facie* case dissolves, and the burden shifts back to the plaintiff to raise a fact dispute material to determining either: (1) that the employer's proffered

reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Vaughn*, 665 F.3d at 636 (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

Turner has made a *prima facie* showing. The elements of a *prima facie* showing are that the plaintiff: (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class or, in the case of disparate treatment, was treated more harshly than others who were similarly situated. *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001). In reduction-in-force cases, the Fifth Circuit modifies the fourth element to require a showing that others who were outside the protected class remained in similar positions. *Taylor v. County Bancshares, Inc.*, 325 F.Supp. 2d 755, 769 (E.D. Texas, 2004) (citing *Bauer v. Albermarle Corp.*, 165 F.3d 962, 966 (5th Cir. 1999)). Turner was qualified, belonged to a protected class, and was laid off from a department that retained workers outside of his protected class.

CSC has produced summary judgment evidence that meets its burden of proffering legitimate, nondiscriminatory reasons for its decision to include Turner in the reduction-in-force. The parties do not dispute that NASA requested CSC to reduce costs, which required lay offs. It is undisputed that layoffs were frequent at CSC and in this industry. Provenzano, the person who hired Turner, decided to include Turner, along with three Caucasian employees and two Hispanic employees, in the group selected for lay off. *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 421-22 (5th Cir. 2009) (holding that "[t]he same actor inference creates a presumption that animus was not present where the same actor responsible for the adverse employment action either

hired or promoted the employee at issue"). This decision was approved by McCoy and by the Human Resources Department at CSC's corporate headquarters.

CSC produced competent summary judgment evidence showing that NASA employees had complained about him. (Docket Entry No. 30-8 at 3; 30-3 at 9; 30-9 at 7-8). Additionally, CSC produced competent summary judgment evidence that Turner had poor relations with his own coworkers. The record reflects that electricians did not want to work with him because he repeatedly told union representatives and CSC management that the company hired "too many" electricians. Electricians made up half the employees in Turner's shop. Turner had disputes with Russell Nix, the union bull steward, as well as Vise, a pipe fitter and the pipe fitter union steward. (Docket Entry No. 30-1 at 11). Finally, CSC has produced evidence, including statements from Turner's own deposition, that he was not willing to perform electrical work that pipe fitters at times had to do. (Docket Entry No. 30-6 at 28-28, 36; 30-9 at 13-14). That, as well as the complaints against him, distinguished him from the three other pipe fitters in his department, Carter, Winkelman, and Vise.

In addition, Carter was more familiar with the electronic controls at Johnson Space Center because he had previously installed them. (Docket Entry No. 30-6 at 2, 4–5, 36; 30-9 at 13–14). Winkelman was the foreman at the shop. (Docket Entry No. 30-6 at 12–13; 30-4 at 11–14, 16–17; 30-10 at 2–4, 8). Vise was both a licensed electrician and pipe fitter and could perform both types of work. (Docket Entry No. 30-9 at 29–30). The qualifications and positions of the other pipe fitters compared to Turner's provided CSC with additional legitimate, nondiscriminatory reasons to choose to retain Carter, Winkelman, and Vise over Turner in the reduction-in-force.

CSC has produced ample evidence showing that it chose Turner for inclusion in the reduction-in-force for legitimate, nondiscriminatory reasons. The burden shifted to Turner to point

14

to "substantial evidence to create a jury question regarding discrimination." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999). He has failed to do so.

Turner provided his own affidavit and deposition testimony that he was the most qualified person for the job. But an employee's subjective belief that he was the most qualified, or that employment actions were based on discrimination, is not sufficient to raise a fact dispute. *Sanchez v. Dallas/Fort Worth Int'l Airport Bd.*, 438 F. App'x 343, 346–47 (5th Cir. 2011) (citing *DIRECTV, Inc. v. Budden,* 420 F.3d 521, 531 & n. 49 (5th Cir.2005) (holding that a self-serving affidavit alone will not defeat summary judgment)).

CSC provided competent evidence that Turner had a number of disputes, disagreements, and shouting matches with his coworkers. Turner does not dispute this evidence. He acknowledges that he had angered his colleagues. Turner provided notes from a meeting where it was noted that Turner had good technical skills and was a good pipe fitter along with an email and letter from two NASA employees to the effect that Turner was a good employee. (Docket Entry No. 32-3; 32-4; 32-6 at 5). But he does not controvert CSC's evidence that he had poor working relationships with his coworkers and had difficulties with NASA employees as well. Turner does not dispute that the altercations and conflicts with different employees did occur. Nor does he dispute that half the members of his own small department were angry at him for the critical comments he made about electricians at CSC. The fact that some members of CSC management viewed Turner as a skilled pipe fitter or that two NASA employees viewed Turner as competent has little relevance in the context of a reduction-in-force, in which "some employees may have to be let go despite competent performance." *E.E.O.C. v. Tex. Instruments*, 100 F.3d 1173, 1181 (5th Cir. 1996); (Docket Entry No. 30-8 at 9). CSC has not contended that everyone at CSC or NASA disliked Turner or thought

that he was an inadequate employee. CSC instead presented uncontroverted evidence that Turner had multiple issues, altercations, and conflicts with CSC coworkers and NASA employees. CSC has provided competent summary judgment evidence supporting its assertion that Turner, unlike the other CSC pipe fitters, did not like to perform electrical work and refused to work with high-voltage electricity, and Turner has not pointed to competent controverting evidence. (Docket Entry No. 30-3 at 41; Docket Entry 30-5 at 3; Docket Entry No. 30-6 at 3, 36).

The record contains ample evidence of Turner's performance problems, of how his qualifications compared to other pipe fitters he worked with, and of his poor relationships with his coworkers. Turner has neither pointed to nor submitted any evidence to show that the retained employees had similar conflicts in their relationships with coworkers or similar performance deficiencies but were retained as employees during the reduction-in-force. The evidence does not raise a fact issue as to whether CSC's stated reasons were a pretext for discrimination. The motion for summary judgment on the discrimination claim is granted.

  **B.** **Retaliation**

Under Title VII, it is unlawful for any employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Id*. § 2000e–3(a) (emphasis added). The first part of Title VII's antiretaliation provision is the "opposition clause," and the second part is the "participation clause." *See, e.g.*, *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419 (5th Cir. 2000).

When, as here, a plaintiff seeks to prove retaliation through circumstantial evidence, he has the initial burden to make a *prima facie* showing that: (1) he was engaged in activity protected by

16

Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action. *Aryain v. Wal–Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008). If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for the employment action. *Id*. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id*. "Title VII retaliation claims must be proved according to traditional principles of but-for causation. . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ––– U.S. ––––, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013); *see also Wright v. St. Vincent Health Sys.*, ––– F.3d ––––, 2013 WL 5225214, at *4 (8th Cir. Sept.18, 2013) (applying a "but for" causation standard to a § 1981 retaliation claim).

Title VII's antiretaliation provision "must be construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, ––– U.S. ––––, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011). In *Burlington Northern and Santa Fe Railroad Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court held that employer actions prohibited by the antiretaliation provision, unlike actions prohibited under the antidiscrimination provision, were not limited to conduct that affects the employee's "compensation, terms, conditions, or privileges of employment," § 2000e–2(a)(1), because adopting that approach "would not deter many forms that effective retaliation can take." *Id*. at 64. The Court interpreted Title VII's antiretaliation provisions again in *Thompson v. North American Stainless, L.P.*, holding that those provisions were broad enough to protect an employee who was fired in retaliation for a discrimination charge filed by family member. "Title VII's antiretaliation provision prohibits any employer action that 'well might

17

have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 868 (quoting *Burlington N.*, 548 U.S. at 68). "It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Burlington N.*, 548 U.S. at 68 (internal quotation marks and citation omitted). Nevertheless, "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id*.

Turner must show that: (1) he engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action. *Aryain*, 534 F.3d at 484. Protected activities are those that involve opposition to a discriminatory practice or involvement in the proceeding or investigation of a discriminatory practice. *Spinks v. Trugreen Landcare, L.L.C.*, 322 F. Supp. 2d 784, 796 (S.D. Tex. 2004); Tex. Lab. Code § 21.055.

Turner bases his retaliation claim on three events: (1) his June 19, 2010 grievance; (2) his October 6, 2010 letter to his personnel file; and (3) his statements that the EMCS shop should not employ electricians. (Docket Entry No. 30-7 at 10, 23-24).

Turner's complaints were based on union issues and personality conflicts with his coworkers. (Docket Entry No. 30-3 at 27; 30-5 at 2-5; 30-10 at 11). None of Turner's complaints alleged discriminatory acts. Turner accused some of his coworkers of "lashing out" against him in response to his complaints about CSC hiring too many electricians and not giving pipe fitters the work they should have. (Docket Entry No. 30-7 at 13, 17; 30-4 at 18). Turner admitted to Provenzano and McCoy on separate occasions that he had not alleged racial harassment or discrimination. (Docket

Entry No. 30-3 at 27; 30-8 at 5). None of Turner's complaints or statements about the EMCS shop allege racial discrimination or practices made unlawful under TCHRA.

Even if Turner's June 19, 2010 grievance, his October 6, 2010 letter, or his statements about the EMCS electricians were protected activity under Title VII, he has not presented or pointed to summary judgment evidence of a causal link between this activity and the decision to include him in the reduction-in-force. Turner alleged that after he spoke out against EMCS employing electricians, his coworkers' "demeanor" toward him changed. (Docket Entry No. 30-7 at 8–9). Turner acknowledged that he has no evidentiary support for this assertion. The timing of events undermines his assertion. Turner was employed for over nine months after he criticized the electricians hired by CSC and after he filed his complaints with Human Resources. During that nine-month period, Turner was kept as an employee through multiple other layoffs. (Docket Entry No. 30-5 at 3–4).

Turner's summary judgment evidence establishes only that he was subject to an adverse employment action. Turner has not provided or pointed to competent summary judgment evidence supporting an inference that his grievances and complaints were protected activities under Title VII or that there was a causal link between the protected activities and the adverse action. Summary judgment is granted on Turner's retaliation claim.

      **C.    Hostile Work Environment**

"To establish a hostile work environment claim under Title VII, the plaintiff must prove that [he]: (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the

harassment in question and failed to take prompt remedial action." *Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014) (citations omitted). The summary judgment evidence, construed in the light most favorable to Turner, shows only that some of his coworkers did not speak with him and some, especially Vise, had ongoing disputes with him. The summary judgment evidence shows that Turner's coworkers thought that he was creating a hostile work environment through his comments about electricians, his workplace altercations, and his frequent episodes of using loud and threatening tones in exchanges with coworkers. Summary judgment is appropriate on Turner's hostile work environment claim, to the extent that it is raised.

### D. The Texas Labor Code Claim

The TCHRA claims are analyzed under the same legal standards as Title VII and § 1981 claims. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia,* 372 S.W.3d 629, 633–34 (Tex. 2012)). Turner's TCHRA claims fail for the same reasons that his § 1981 claim failed. Summary judgment for CSC is appropriate.

## IV. Conclusion

CSC's motion for summary judgment is granted. Final judgment will be entered by separate order.

SIGNED on August 1, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge